# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

EDIN PUPIC,                          )
                                     )
             Plaintiff,         )
                                     )
v.                                   )      No. 4:15-cv-00599-AGF
                                     )
CAROLYN W. COLVIN,                   )
Acting Commissioner of Social Security, )
                                     )
             Defendant.         )
                                     )

## MEMORANDUM AND ORDER

This action is before the Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Edin Pupic was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, or supplemental security income under Title XVI of the Act, 42 §§ 1381-1383f. For the reasons set forth below, the decision of the Commissioner will be affirmed.

## BACKGROUND

Plaintiff, who was born on September 14, 1961, filed applications for disability benefits and supplemental security income on February 27, 2012, alleging a disability onset date of September 27, 2011, due to both mental and physical impairments. His alleged mental impairments included post-traumatic stress disorder ("PTSD"), severe

depression, and insomnia.[1]  The Social Security Administration denied Plaintiff's claims on April 25, 2012, and Plaintiff filed a request for a hearing before an administrative law judge ("ALJ").  Following a hearing on May 9, 2013, the ALJ issued a written decision on September 4, 2013, denying benefits.  Plaintiff requested review of the ALJ's decision by the Appeals Council; the request was denied on February 5, 2015.  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole.  Specifically, Plaintiff argues that the ALJ failed to fully describe how medical and other evidence supported the ALJ's determination of Plaintiff's residual functional capacity ("RFC"); failed to consider all of the relevant evidence in determining Plaintiff's RFC; and failed to give proper weight to the opinion of Plaintiff's therapist and licensed clinical social worker, Helen McGlynn, Ph.D., whom Plaintiff admits is not an "acceptable medical source," as defined in the Commissioner's regulations.[2]

## Work History and Application Forms

Plaintiff represented on his application forms that he worked from 1999 to 2006 as a supervisor for a cleaning service, and from 2006 to 2011 as a long-distance truck driver.

---

[1]     As Plaintiff's legal arguments relate only to his mental impairments, this Memorandum and Order does not discuss Plaintiff's physical impairments, including his alleged spine and leg problems, vision problems, swollen feet, and shortness of breath.

[2]     The record does not reflect the subject in which Helen McGlynn earned her Ph.D., but the parties agree that she is not an acceptable medical source because she is not a licensed or certified psychologist.  They nevertheless refer to her as "Dr. McGlynn," in light of her Ph.D., and the Court will do the same.

He indicated that he stopped working on September 27, 2011 because of his conditions. (Tr. 155-56.) Plaintiff also indicated that his primary language was Bosnian and that he could not read or write much in English.[3] (Tr. 161.)

On a third-party Function Report dated March 16, 2012, and completed by Plaintiff's daughter, with whom Plaintiff lived at the time, Plaintiff's daughter described Plaintiff's typical daily activities as getting up in the morning, taking his medicine, having coffee with his daughter, and otherwise being uninterested in doing anything unless his daughter took him somewhere. (Tr. 162.) Plaintiff's daughter reported that Plaintiff's conditions affected his sleep; that although Plaintiff was able to maintain personal care and complete some yard work, he did not want to do these things alone; and that his conditions affected his concentration, memory, understanding, ability to follow instructions, and ability to get along with others. (Tr. 163-68.)

**<u>Medical Records</u>**

On February 15, 2012, Plaintiff presented to Places for People, a mental health organization, for an initial psychiatric evaluation with licensed psychiatrist Mirela Marcu, M.D. Plaintiff was accompanied by his wife and an interpreter. Plaintiff, a Bosnian war survivor who had been physically beaten and emotionally tortured during the war, reported that he had flashbacks of the war at least two to three times per week, elicited by various triggers from the environment. Plaintiff reported hearing voices, especially the voice of a friend who was killed during the war, and being depressed, with symptoms

---

[3]    It is unclear from the record whether Plaintiff completed this form on his own or with the assistance of an interpreter.

including decreased pleasure and interest, poor sleep, and intrusive thoughts.  (Tr. 214.)

In a mental status examination, Dr. Marcu indicated that Plaintiff was cooperative and

pleasant, but that he had a depressed mood.  Dr. Marcu recorded that Plaintiff had no

suicidal or homicidal ideations, but she noted the presence of auditory hallucinations and

paranoid delusions.  She indicated that Plaintiff had good insight and judgment, and a

goal-directed thought process.  Dr. Marcu diagnosed Plaintiff with PTSD and severe

major depressive disorder.  She prescribed Cymbalta and Klonopin, and referred Plaintiff

to therapy.  Dr. Marcu also assigned Plaintiff a Global Assessment of Functioning

("GAF") score of 40.[4]   (Tr. 218.)

Plaintiff returned to see Dr. Marcu on March 7, 2012, accompanied again by his

wife and an interpreter.  He reported improvement; he was less anxious, felt less hopeless

and worthless, and had better sleep and an improved mood.  However, Plaintiff also

reported still feeling isolated, being easily startled, hearing voices, and feeling like

someone was "on [his] back."  Dr. Marcu noted that Plaintiff was pleasant and had clean

clothes, normal speech, and fair insight and judgment.  On this visit, Dr. Marcu

diagnosed Plaintiff with PTSD and psychosis, and added Abilify to Plaintiff's prescribed

medication.  (Tr. 220.)

---

[4]     The GAF, or Global Assessment of Functioning, is a numeric scale ranging from zero to one hundred used to rate social and psychological functioning.  Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n, Text Revision 2000) (DSM-IV-TR).  A GAF of 31-40 is defined as having some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  *Id.*  However, "[i]n recent years, the agency has recognized, and [the Eighth Circuit has] noted, that GAF scores have limited importance."  *Nowling v. Colvin*, No. 14-2170, 2016 WL 690821, at *3 (8th Cir. Feb. 22, 2016).

On March 8, 2012, Plaintiff underwent an initial assessment with Dr. McGlynn, a therapist at the Center for Survivors of Torture and War Trauma.[5] Plaintiff reported that he had been in a truck accident several months before, when he was driving his truck in the rain. (Tr. 266-69.) Plaintiff reported that he saw his "dead friend" on the seat next to him at the time of the accident. (Tr. 307-08.) Plaintiff indicated he was fired from his job after the accident. Plaintiff also reported hallucinations, such as frequently hearing his deceased friend's voice and seeing white mice. Dr. McGlynn assessed Plaintiff's GAF score as 38. Dr. McGlynn reported that Plaintiff's general appearance, motor activity, affect/mood/attitude, thought content and process, orientation, insight, and judgment, were all within normal limits, and she recorded no suicidal ideation. (Tr. 266-69.)

Plaintiff engaged in weekly psychotherapy with Dr. McGlynn through the end of March 2012. They discussed improving his poor sleep and reducing the hallucinations of his deceased friend. Dr. McGlynn reported that Plaintiff appeared well-groomed and was cooperative but depressed. (Tr. 303-06.)

Plaintiff returned to see Dr. Marcu on April 11, 2012, again attending his appointment with a family member and an interpreter. At this time, Plaintiff reported some improvement in his anxiety and depression, but he again reported poor sleep and appetite, stating that he lost 15 pounds in the last two months. On mental status examination, Dr. Marcu observed that Plaintiff appeared disheveled, tired, and unshaven.

---

[5]     It is unclear whether an interpreter accompanied Plaintiff in his visits with Dr. McGlynn.

Dr. Marcu noted that Plaintiff's speech was soft and he exhibited a depressed and constricted affect. Plaintiff still had no suicidal or homicidal ideations, but he continued to talk to his deceased friend, whom he stated died in his arms during the war.

Plaintiff saw Dr. McGlynn for six more psychotherapy sessions between April 12, 2012 and June 13, 2012. (Tr. 293-300.) On April 17, 2012, Plaintiff reported that Cymbalta was helping him and that Abilify helped to calm him, but that he still could not sleep. Dr. McGlynn observed that Plaintiff appeared disheveled, depressed, and irritable, but she also indicated that he was insightful and she did not indicate that he lacked concentration. (Tr. 299.) On April 25, 2012, Plaintiff stated that he got "panicky when away from home." (Tr. 298.) Throughout June 2013, Plaintiff continued to report that he saw and spoke with his deceased friend. During these visits, Dr. McGlynn observed that Plaintiff was well-groomed and cooperative but had a depressed mood. (Tr. 293-94.)

Plaintiff had a follow-up appointment at Places for People on June 27, 2012.[6] During this visit, Plaintiff, accompanied by an interpreter, reported that he was still isolating himself and feeling irritable and pessimistic. However, Plaintiff reported that his anxiety had decreased, and he had no suicidal or homicidal ideations. On mental status examination, Plaintiff's speech, thought process, thought content, insight, and judgment were all within normal limits. Plaintiff was reported to be dysphoric and sarcastic, with poor eye contact and a restricted and irritable affect. Plaintiff was

---

[6]     The parties agree that the progress notes for this appointment do not appear to have been written by Dr. Marcu, so the parties assume that Plaintiff was treated by a different provider on this date.

diagnosed with depression and PTSD with psychotic features. His medication prescriptions were continued, and his prescription for Abilify was increased. (Tr. 248.)

Plaintiff had two more psychotherapy sessions with Dr. McGlynn in July 2012, during which Dr. McGlynn observed that Plaintiff was well-groomed, cooperative, and insightful, but also agitated and depressed. (Tr. 290-92.)

Dr. Marcu treated Plaintiff again on August 8, 2012. Plaintiff attended the visit with an interpreter, his daughter, a case worker, and a therapist. Plaintiff and his daughter felt that Plaintiff had not made any improvement, but Plaintiff reported that his sleep had improved. Plaintiff also reported continuing to have nightmares, but stated that they occurred less frequently. Plaintiff reported that he was living with his daughter because he could no longer live with his large family. Plaintiff continued to have visual and auditory hallucinations of his deceased friend, and Dr. Marcu observed that Plaintiff was very depressed, was hopeless, and had a constricted affect. Dr. Marcu noted that Plaintiff appeared to be very dysphoric and irritable but that he had fair insight and judgment. Dr. Marcu stated that Plaintiff did not want his medication changed. (Tr. 249.)

Plaintiff was treated by his general practitioner, Gopy Arumugam, M.D., on August 21, 2012. He reported no feelings of hopelessness and stated that his mood was currently well-controlled with medication. (Tr. 233-35.)

Plaintiff last saw Dr. Marcu on September 5, 2012. Plaintiff initially stated that he was doing well but later stated that he was ill, did not work, and talked to people that

were not there.  Dr. Marcu assessed Plaintiff with symptomatic PTSD and continued his

medications.  (Tr. 250.)

Plaintiff visited again with Dr. Arumugam on November 9, 2012, at which time he

again denied feelings of hopelessness, had a normal appearance and affect, and had a

euthymic mood.  (Tr. 225-26.)

Plaintiff continued to engage in regular psychotherapy with Dr. McGlynn from

September 2012 to May 2013.  (Tr. 273-89.)  Plaintiff continued to report seeing his

deceased friend and not sleeping well.  (Tr. 284, 286, 288.)  On February 20, 2013, Dr.

McGlynn noted that Plaintiff was "better" and "stable," he appeared well-groomed, and

was cooperative but had agitated motor activity, had a depressed mood, and still had

auditory and visual hallucinations.  (Tr. 282.)  On March 6, 2013, Dr. McGlynn observed

that Plaintiff was well-groomed, relaxed, had a normal mood, and was focused.

Likewise, on May 15, 2013, Dr. McGlynn observed that Plaintiff appeared well-groomed,

was cooperative, had relaxed motor activity, and had a normal mood.  (Tr. 273.)

Dr. McGlynn completed a mental medical source statement on behalf of Plaintiff

on April 11, 2013.  In activities of daily living, Dr. McGlynn checked that Plaintiff had

marked limitation in ability to cope with normal work stress and function independently,

and moderate limitation in ability to behave in an emotionally stable manner.  In the area

of social functioning, Dr. McGlynn checked that Plaintiff had marked limitation in ability

to relate in social situations, interact with general public, and accept instructions and

respond to criticism, and moderate limitation in ability to maintain socially acceptable

behavior.  Dr. McGlynn checked that Plaintiff had marked limitation in all areas of

concentration, persistence, or pace. She also wrote that Plaintiff was depressed and isolated, had insomnia, was easily startled, and had intrusive memories and body pain. (Tr. 240-43.)

On September 11, 2013, Plaintiff was treated by psychiatrist Jaron Asher, M.D., at the Family Care Health Centers. (Tr. 321-22.) Dr. Asher diagnosed Plaintiff with PTSD and anxiety. Plaintiff reported to Dr. Asher that Cymbalta had helped him but had not helped him enough. Dr. Asher noted that Plaintiff needed an increase in his medication, and if that did not work, a change in his medication. Dr. Asher believed that Plaintiff's hallucinations of his deceased friend were due to PTSD and not psychosis. He recommended increasing Plaintiff's dosage of Cymbalta and Abilify, letting the changes take effect, and then having Plaintiff return to his therapist. (Tr. 322.) Dr. Asher noted that he was only able to see Plaintiff three times due to the limited psychiatric resources at Family Care Health Centers. (Tr. 321.)

**Evidentiary Hearing of May 9, 2013** (Tr. 27-44)

### 1. Plaintiff's testimony (Tr. 30-40)

Plaintiff testified at the hearing through an interpreter. At the time of the hearing, Plaintiff was 51 years old. Plaintiff testified that he was a college graduate, having earned a degree in gymnastics education in Bosnia. He testified that he was a citizen, and to become a citizen, he was required to pass a citizenship test in English. He testified that he could speak a little English, but he preferred to speak through an interpreter, and that in prior employment as a cleaning crew supervisor, he supervised and was able to communicate with workers who spoke English, Bosnian, and Spanish.

Plaintiff testified that he was previously a long-distance truck driver but that he stopped working in 2011, after the truck accident noted above, which did not injure him too badly but which exacerbated mental problems he had from his experience in the Bosnian war. Plaintiff testified that his friend who was killed in the war came to talk to him, and that he talked to his deceased friend for two hours at a time, approximately three times over a two-week period. Plaintiff testified that this deceased friend appeared in his truck at the time of the 2011 accident. However, he believed the accident was caused by a lack of warning signs on the road, and not by seeing his deceased friend, because he had talked to his deceased friend "a lot" before the accident without any incident.

Plaintiff further testified that ten days before the hearing, he saw "many" white mice running into a hole in the wall, but he could not find the hole later. Plaintiff testified that he had seen the mice before then, too, but only sometimes. Plaintiff testified that he had thoughts of his war experiences even when he did not want to and that this happened approximately three to five times over a two-week period.

Plaintiff testified that he could only sleep for four hours a night, even with medicine, and that he had "huge" problems with concentration and focus. He testified that when he read the newspaper or watched television, he would realize that he was thinking about something totally different. He testified that he had similar experiences a "long time ago" but that his prior experiences did not occur as often or for as long. Plaintiff further testified that he forgets things very easily and that he lives with his daughter and does not go outside the house by himself.

## 2. **Testimony of Vocational Expert (Tr. 40-44)**

The ALJ asked the VE about a hypothetical individual with the same education and vocational background of Plaintiff, with certain physical limitations, who was able to understand, remember, and carry out at least simple instructions and non-detailed tasks; can respond appropriately to supervisors and coworkers in a task or in a setting where contact with others is casual and infrequent; should not work in a setting which includes constant or regular contact with the general public; and should not perform work which includes more than infrequent handling of customer complaints. The ALJ asked the VE whether such an individual could perform any of Plaintiff's past relevant work. The VE testified that, with those limitations, such an individual could not perform Plaintiff's past relevant work as a truck driver or cleaning crew supervisor.

The ALJ then asked the VE whether such an individual could perform any jobs that exist in significant numbers on a regional and national level. The VE testified that such an individual could perform the jobs of electronics hub assembler and production assembler, which exist in significant numbers in the national economy.

Plaintiff's attorney altered the hypothetical in his questioning of the VE, to add that the individual had marked limitation—defined as a limitation that seriously interferes with his ability to function independently, appropriately, and effectively—in coping with normal work stress, accepting instructions, responding to criticism, and maintaining attention to work tasks for up to two hours. The VE testified that, for such an individual, work would be precluded.

The ALJ concluded the hearing by stating that he would refer Plaintiff to a psychological consultative examination, along with an interpreter.

**Consultative Examination of May 30, 2013** (Tr. 256-62)

Plaintiff attended a psychological consultative evaluation conducted by licensed psychologist Kirmach Natani, Ph.D., on May 30, 2013, accompanied by an interpreter. Plaintiff reported to Dr. Natani that he was depressed all the time and that his 2011 truck accident, which occurred while he was driving through the rain at a construction site, revived many of his memories from the war. Plaintiff stated that he had "spells" related to his war experiences before his truck accident too, but they had worsened since the accident. Plaintiff stated that he could no longer drive a truck, and that he no longer lived with his wife and some of his children because they did not understand how much the truck accident and loss of his job affected him.

In a mental status examination, Dr. Natani observed that Plaintiff was alert, oriented, cooperative, and maintained good eye. Plaintiff showed no evidence of problems expressing himself, but he was somatically occupied. Plaintiff's mood was dysthymic, his affect was anxious, and his thinking was concrete, though he was preoccupied with his physical problems. Plaintiff reported having flashbacks about the war, seeing things that were not there, and having conversations with his deceased friend. Plaintiff could not repeat more than three of six digits forward or backward; he knew the current and past two presidents, but not the Missouri governor; he refused to perform a "serial 3s" task, stating that he was too tired; his simple arithmetic was correct; and he demonstrated fair insight and judgment. (Tr. 258.)

12

Dr. Natani noted that Plaintiff helped with some household chores, but did not pay bills, cook, shop, drive, use public transportation, or engage in activities outside the home. Dr. Natani assessed Plaintiff's concentration during the examination as adequate but stated that his persistence was impaired by fatigue, possibly because he had not slept well the night before, and his pace was slow. (Tr. 258-59.)

Dr. Natani diagnosed Plaintiff with PTSD, with his symptoms becoming more severe after his 2011 truck accident, and mood disorder due to his general medical condition. She assigned Plaintiff a GAF score of 55, indicating moderate symptoms related to depression PTSD and personality factors. She assessed Plaintiff's prognosis as "poor." (Tr. 259.)

On May 30, 2013, Dr. Natani also completed a mental medical source statement regarding Plaintiff's ability to do work-related activities. Dr. Natani checked that Plaintiff had mild limitation in understanding, remembering, and carrying out simple instructions, and moderate limitation in his ability to make judgments on simple and complex work-related decisions and his ability to understand, remember, and carry out complex instructions. She also checked that Plaintiff had moderate limitation in interacting appropriately with the public, supervisors, and coworkers, and in responding appropriately to usual work situations and changes in a routine work setting. Dr. Natani wrote that Plaintiff had difficulty functioning in English, and as he was clinically depressed, he was not motivated to expend any effort to compensate for his poor English. She further wrote that Plaintiff had become a recluse at home because he did not want to

reveal his mental health problems to anyone. Dr. Natani indicated Plaintiff's impairment did not affect any other capabilities. (Tr. 260-62.)

**ALJ's Decision of September 4, 2013** **(Tr. 7-25)**

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since September 27, 2011, the alleged disability onset date. The ALJ found that Plaintiff had the severe physical impairments of degenerative changes of the lumbar spine and spur formation of the left ankle, and the severe mental impairments of major depressive disorder and PTSD, but that no impairment or combination of impairments met or medically equaled the severity of one of the deemed-disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ determined that Plaintiff had the RFC to perform light work as defined in the Commissioner's regulations, in that, as relevant here, he could understand, remember, and carry out at least simple instructions and non-detailed tasks; he could respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others was casual and infrequent; he could not work in a setting that included constant or regular contact with the general public; and he could not work in a setting that included more than infrequent handling of customer complaints.

The ALJ relied on the VE's testimony that an individual with Plaintiff's RFC, age, and vocational background could perform certain jobs that existed in substantial numbers in the national economy, such as electronic subassembler and production assembler. Thus, the ALJ found that Plaintiff was not disabled as defined by the Act.

In making his findings with respect to Plaintiff's RFC assessment, the ALJ summarized Plaintiff's reports that the 2011 truck accident revived his memories of the Bosnian war, including Plaintiff's reports of hearing his deceased friend's voice, depression, anxiety, difficulty sleeping, and flashbacks. The ALJ also summarized Plaintiff's psychological consultative examination with Dr. Natani, his treatment by Dr. Marcu and Dr. Arumugam, and his psychotherapy sessions with Dr. McGlynn.

The ALJ noted that Dr. Natani's medical source statement indicated that Plaintiff had moderate limitation in "areas of social functioning and concentration, persistence and pace." (Tr. 19.) The ALJ accorded that opinion "great weight" for the stated reasons that Dr. Natani was a specialist who had an opportunity to examine Plaintiff in person and because the limitations were consistent with her examination findings and with Plaintiff's treatment records. Specifically, the ALJ noted Plaintiff's reports to Dr. Marcu of improvement in March and April of 2012, and Dr. Arumugam's notes in August and November 2012 that Plaintiff had euthymic mood and normal affect, reported no feelings of hopelessness, and reported that his mood was well controlled with medicine.

The ALJ assigned "little weight" to Dr. McGlynn's April 11, 2013 opinion that Plaintiff had marked limitations in areas of social functioning and concentration, persistence, and pace, for the stated reason that Dr. McGlynn was not an acceptable medical source, as defined in the Commissioner's regulations.

## DISCUSSION

The Court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. *Pate–Fires v. Astrue*, 564

F.3d 935, 942 (8th Cir. 2009).  In determining whether the evidence is substantial, the

Court considers evidence that both supports and detracts from the Commissioner's

decision.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).  As long as substantial

evidence supports the decision, the Court may not reverse it merely because substantial

evidence exists in the record that would support a contrary outcome or because the court

would have decided the case differently.  *See Krogmeier v. Barnhart*, 294 F.3d 1019,

1022 (8th Cir. 2002).  A court should "disturb the ALJ's decision only if it falls outside

the available zone of choice."  *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015)

(citation omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in

substantial gainful activity which exists in the national economy, by reason of a

medically determinable impairment which has lasted or can be expected to last for not

less than 12 months.  42 U.S.C. § 423(d)(1)(A).  The Commissioner has promulgated

regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation

process to determine disability.  The Commissioner begins by deciding whether the

claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the

Commissioner decides whether the claimant has a "severe" impairment or combination of

impairments.  A severe impairment is one which significantly limits a person's physical

or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).  A special

technique is used to determine the severity of mental disorders.  This technique calls for

rating the claimant's degree of limitations in four areas of functioning: activities of daily

living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 404 .1520a(c)(3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in the Commissioner's regulations. If not, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work. If so, the claimant is not disabled. If he cannot perform his past relevant work, the burden of producing evidence shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors—age, education, and work experience. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). "However, the burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Hensley v. Colvin*, No. 15-2829, 2016 WL 3878219, at *3 (8th Cir. July 18, 2016) (quotation omitted).

## The RFC Determination

Plaintiff argues that the ALJ failed to consider all relevant evidence and failed to fully describe how the medical and other evidence he did consider supported his RFC determination. Specifically, Plaintiff argues that the ALJ "erroneously asserted that Dr. Natani assessed Plaintiff with moderate limitation in concentration, persistence, and

pace," when Dr. Natani actually found that Plaintiff had impaired persistence, due to poor sleep, and slow pace. Plaintiff further argues that the ALJ's finding that Plaintiff was able to carry out at least simple instructions and work tasks on a regular and continuing basis contradicts Dr. Natani's findings with respect to his persistence and pace, and the ALJ failed to explain this inconsistency. Finally, Plaintiff argues that the ALJ discussed only some portions of Dr. Marcu's and Dr. McGlynn's medical records, and did not fully discuss, for example, Plaintiff's history of torture and abuse during his war service; Plaintiff's symptoms of hallucinations, flashbacks, and poor sleep; and Plaintiff's low GAF scores.

After careful review of the record, the Court concludes that substantial evidence supports the ALJ's RFC determination. As an initial matter, the Court agrees with Defendant that the ALJ's description of Dr. Natani's opinion was accurate. The ALJ correctly asserted that Dr. Natani's report indicated that Plaintiff had moderate limitation in "areas of" concentration, persistence, and pace. (Tr. 19.) Although Dr. Natani found that Plaintiff had impaired persistence, due to poor sleep the night before, and slow pace, she also indicated that he had adequate concentration. Further, her mental medical source statement indicated Plaintiff had only mild limitation in the specific areas of understanding, remembering, and carrying out simple instructions; and moderate limitation in making simple and complex work-related decisions and in understanding, remembering, and carrying out complex instructions.

The ALJ's RFC determination accounted for Dr. Natani's findings in this regard by limiting Plaintiff to jobs that involved only simple instructions and non-detailed work

18

tasks. *See Hensley*, 2016 WL 3878219, at *4 ("The ALJ's RFC determination accounted for Hensley's mental impairments [of PTSD] by limiting him to jobs that involve simple, repetitive tasks learned by rote, with incidental interpersonal contact and simple, direct, concrete supervision."); *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) ("[T]he ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures Howard's deficiencies in concentration, persistence or pace.").

Plaintiff's remaining arguments with respect to the ALJ's RFC determination appear to fall within the category of deficiencies in opinion writing. "An arguable deficiency in opinion writing that had no practical effect on the decision is not a sufficient reason to set aside the ALJ's decision," and an "ALJ is not required to discuss every piece of evidence submitted." *Hensley*, 2016 WL 3878219, at *4. Here, the ALJ properly cited specific evidence in the record that supported his finding that Plaintiff had some limitations due to his impairments, but that these limitations were not disabling. Specifically, the ALJ correctly noted that while Plaintiff consistently reported symptoms of hallucinations, depression, anxiety, flashbacks, and poor sleep, he also indicated that medication helped improve or control these symptoms. Moreover, in some of his most recent psychotherapy sessions with Dr. McGlynn, in March and May of 2013, Dr. McGlynn observed that Plaintiff was well-groomed, cooperative, relaxed, in a normal mood, and focused.

Also, although the ALJ did not specifically reference the GAF scores assessed by Dr. Marcu and Dr. McGlynn, he did discuss these providers' records containing the GAF

scores, which suggests that he considered the scores when considering the overall evidence. *See Bradley v. Astrue*, 528 F.3d 1113, 1115 n.3 (8th Cir. 2008) ("Bradley contends the ALJ erred by failing to consider Bradley's [GAF] score. Given this test was part of Dr. True's assessment, the ALJ necessarily considered the test when considering the overall evidence from Dr. True.").

While "GAF scores are not determinative of RFC, . . . they offer some evidence of a claimant's ability to function." *Hensley*, 2016 WL 3878219, at *4 n.3. Plaintiff's low GAF scores of 38 and 40 in February and early March of 2012 give the Court pause. However, the Court notes that in his May 2013 consultative examination, Dr. Natani, a specialist, assessed Plaintiff to have a much higher GAF score of 55. In any event, "an ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." *Jones v. Astrue*, 619 F.3d 963, 974 (8th Cir. 2010). Here, as discussed above, the ALJ cited medical evidence supporting his RFC finding. Therefore, although it is a close question and the case could be decided differently, the Court cannot say that the ALJ's RFC determination fell outside the available zone of choice.

**Opinion of Plaintiff's Therapist, Dr. McGlynn**

As Plaintiff admits, Dr. McGlynn is not an acceptable medical source, as defined in the Commissioner's regulations, because she is not licensed or certified as a psychologist. 20 C.F.R. § 404.1513(a). "[T]here are three major distinctions between acceptable medical sources and the others: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, (2)

only acceptable medical sources can provide medical opinions, and (3) only acceptable medical sources can be considered treating sources." *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (citations omitted). "Other sources" include medical sources such as nurse practitioners, physician assistants, chiropractors, and licensed clinical social workers or therapists like Dr. McGlynn. *Id.*

"Evidence provided by 'other sources' must be considered by the ALJ; however, the ALJ is permitted to discount such evidence if it is inconsistent with the evidence in the record." *Lawson v. Colvin*, 807 F.3d 962, 967 (8th Cir. 2015). Factors governing the consideration of opinions from other sources include the length of the relationship, frequency of examination, how well the opinion is supported, consistency with other evidence, and expertise or specialty of the source. *Blackburn v. Colvin*, 761 F.3d 853, 859 (8th Cir. 2014) (citing 20 C.F.R. §§ 404.1527(c), 416.927(c)); *Sloan*, 499 F.3d at 889 (citation omitted).

As Plaintiff correctly notes, the length of Plaintiff's relationship with Dr. McGlynn, the frequency of her examination, and her specialty in treating survivors of war trauma are factors supporting her opinion. And the ALJ in fact accounted for some of the limitations noted by Dr. McGlynn in his RFC determination, when he found that Plaintiff was limited to simple instructions and non-detailed tasks, and could not work in a setting that included constant or regular public contact or more than infrequent handling of customer complaints. However, as discussed above, the ALJ also cited medical evidence that was inconsistent with Dr. McGlynn's findings of marked limitations in

nearly every area of functioning. Based on these inconsistencies, the ALJ was permitted to discount Dr. McGlynn's opinion.

**CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 29th day of August, 2016.